POLLAK, District Judge,
concurring.
I concur in the court’s judgment in all but one small particular. But I do not join the court’s opinion.
I arrive at substantially the same endpoint as the court — i.e., I agree with the court that the Bankruptcy Court and the District Court were right in disallowing DataComm’s proposed rejection of appel-lees’ Benefit Plan. But I arrive at the same destination via a different route: I do not agree with the court that 11 U.S.C. § 1114 protects the appellees from Data-Comm’s intended unilateral rejection of the Benefit Plan; in my view, appellees are not protected by § 1114 because they were not “retired employees” — the category of persons sheltered by § 1114 — at the time DataComm undertook to terminate the Benefit Plan. However, I conclude that DataComm could not reject the Benefit Plan pursuant to 11 U.S.C. § 365, because that provision authorizes rejection of an *625 “executory contract” and, in my view, the Benefit Plan was not an executory contract.
I.
The court affirms that portion of the Bankruptcy Court order requiring Data-Comm to abide by the provisions of 11 U.S.C. § 1114, which provides procedural safeguards against modification of benefits for “retired employees.” Adverting to the purpose of § 1114, which was “enacted to protect the interests of retirees of Chapter 11 debtors,” 7 Collier on Bankruptcy, ¶ 1114.02[1] (15th ed.2002), and pointing to appellees’ termination without cause, the court holds that appellees ought to be considered retirees within the meaning of § 1114. The court’s argument in favor of treating appellees as, in effect, constructive “retirees” cannot fail to strike a sympathetic chord. Nonetheless, I am not persuaded that appellees can properly be deemed as coming within the category of individuals protected by the statute.
Section 1114 is entitled, “Payment of insurance benefits to retired employees,” id. (emphasis added), signifying that it is the status of the employee, and not the nature of the benefit, that determines the scope of § 1114. The wording of § 1114 cannot be said to give definitive guidance on whether, to claim § 1114’s protections, employees must have retired by the date that their employer files for bankruptcy or, alternatively, whether they must have retired by the date upon which the debtor seeks to terminate retiree benefits.[14] The relevant point for purposes of this appeal, however, is that appellees had not retired by either date: appellees were employees of DataComm when DataComm filed under Chapter 11, and they remained employees until they were dismissed one day after DataComm filed its 365 motion seeking to terminate the Benefit Plan.
To be sure, the court does not argue that appellees had in fact retired by either date. Instead, it adopts the District Court’s argument, which relies on the prevention doctrine, and concludes that appel-lees are constructive retirees who ought thus to receive § 1114’s protections. The prevention doctrine states that “[i]t is a principle of fundamental justice that if a *626 promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.” 5 Williston, Contracts 677, at 224 (3d ed.1961); see also Apalucci v. Agora Syndicate, 145 F.3d 630, 634 (3d Cir.1998) (“when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure.”). The court argues that, since retirement was the condition precedent to receipt of benefits, and since DataComm willfully thwarted fulfillment of this condition when it dismissed appellees (who were at or near retirement age) on the day after DataComm filed its 365 Motion, appellees ought to be considered “retirees” within the meaning of § 1114.
While the pedigree and wisdom of the prevention doctrine are unquestionable, the conclusion that the court draws from it — namely, that § 1114 ought to extend to appellees — is unwarranted. The prevention doctrine entails that, where one party to a contract takes an action that prevents the other party from being able to fulfill a condition precedent to that contract, the first party may not use its own action as a mechanism for avoiding performance of its contractual obligations. The prevention doctrine does not entail that, as a result of the first party’s culpable obstruction, that party is not entitled to avoid performance of its obligations for any reason. There may well be reasons other than the failure of the condition precedent that would allow the first party to withdraw permissibly from the duties it contracted to perform.
Applying the prevention doctrine here signifies that DataComm could not use the fact that appellees had not retired as a ground for withdrawing from its obligation to pay retiree benefits, since DataComm, by firing appellees, prevented them from retiring on the day of their dismissal or at any subsequent time. On the basis of the prevention doctrine, then, the Benefit Plan remained in place despite appellees’ non-retirement. But there might have been other reasons lending support for Data-Comm’s asserted entitlement to withdraw. (Indeed, DataComm claims that § 365 provides one such reason.) Thus, the prevention doctrine does not lead to the conclusion that appellees are (or ought to be treated as) retirees or the conclusion that § 1114 ought to apply to appellees. The prevention doctrine can do no more than return the parties to the situation that existed prior to appellees’ dismissal. Since, for the reasons advanced above, that situation cannot be characterized as one in which appellees had retired, the prevention doctrine does not afford appellees the protections of § 1114.
In sum, § 1114 applies only if the beneficiaries of the agreement in question have retired before their employer seeks to terminate or otherwise modify that agreement. Since that is not the situation here, I conclude that § 1114 is inapplicable.
II.
The court finds that § 1114 applies to appellees and trumps 11 U.S.C. § 365. Accordingly, the court holds that the protections conferred by § 1114 prohibit rejection of the Benefit Plan pursuant to § 365, and require compliance with the terms of § 1114 prior to any modification of the Plan. I agree that DataComm may not reject the Benefit Plan, but I rest this conclusion on the ground that the Benefit Plan was not an “executory contract,” and hence fell outside the coverage of § 365.[15]
*627 An executory contract is “ ‘a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.’ ” Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39 (3d Cir.1989) (citing V. Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L.Rev. 439, 460 (1973)). Thus, for purposes of ascertaining the nature of the Benefit Plan, the relevant question is whether the obligations enumerated in Paragraph 6 of the Plan, which requires that the Plan’s beneficiaries forbear from competing with or disparaging the company, are material.
State law determines whether breach of a contract provision is material. See, e.g., Fineman v. Armstrong World Indus., 980 F.2d 171 (3d Cir.1992). Delaware, where the underlying dispute arose, incorporates the test of materiality found in the Restatement. See BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del.Ch.2003); SLMSoft.Com, Inc. v. Cross Country Bank, 2003 WL 1769770, 2003 Del.Super. LEXIS 112, 51-52 (Del.Super.Ct.2003). To define “materiality,” the Restatement provides a list of “circumstances” deemed to be “significant” in an assessment of “whether a failure to render or to offer performance is material,” Restatement (Second) of Contracts § 241:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Id.
Taking these circumstances one by one, I conclude that the balance of considerations lies on the side of non-materiality:
a) Benefit reasonably expected from the agreement: While DataComm likely expected adherence to the restrictions encompassed in Paragraph 6, it would have harbored this expectation prior to and independent of the Benefit Plan. Some of the obligations contained in this Paragraph simply incorporate prior agreements — for example, the confidentiality agreements in clause (ii)[16] — and it would be these earlier agreements that justified the expectation. Other obligations are so intertwined with the executives’ pre-existing duties of good faith and loyalty — e.g, forbearance from investing in a competitor (clause (i)) or disparaging the company (clause (iii))— that, here too, DataComm’s expectation would not have been rooted in the Benefits Plan. In sum, since DataComm would have received the benefit flowing from appel-lees’ performance of these obligations independent of the Benefit Plan, it does not make sense to consider that performance a benefit that DataComm reasonably expected from the agreement. Or, to put the point in the terms the Restatement uses, *628 performance of the obligations was not a benefit of the agreement.
b) Adequacy of Compensation: The Restatement states that “[t]he second circumstance, the extent to which the injured party can be adequately compensated for his loss of benefit (Subsection (b)), is a corollary of the first.” § 241 cmt. c. For the reasons set forth in the previous paragraph, then, this circumstance also does not support a finding of materiality.
c) Forfeiture: The Benefit Plan permits DataComm to terminate the Plan’s benefits in the face of an eligible executive’s breach of Paragraph 6; it does not state that termination will automatically follow. The fact that an executive could fail to comply with one of the restrictions in Paragraph 6 and still continue to receive the benefits package further supports a finding that the restrictions are not material.
d) Likelihood of cure: In describing this circumstance, the Restatement states that “[t]he fact that the injured party already has some security for the other party’s performance argues against a determination that the failure is material.” § 241 cmt. e. Here, DataComm would have had some security for the executives’ adherence to Paragraph 6: Again, some of the obligations contained there (e.g., obligations of confidentiality) hinge upon prior agreements, breach of which may entail penalties rooted in those agreements. Similarly, legal sanctions for breach of the duty of loyalty would motivate adherence to some of the other restrictions (e.g., those against competition and disparagement).
e) Good faith and fair dealing: The Restatement states that “[ajdherence to the standards stated in Subsection (e) is not conclusive, since other circumstances may cause a failure to be material in spite of such adherence. Nor is non-adherence conclusive, and other circumstances may cause a failure not to be material in spite of such non-adherence.” § 241 cmt. f. In other words, this is a less probative consideration than the others. In the absence of an actual breach of Paragraph 6 by any of the appellees, the implications of this consideration for the materiality of the appel-lees’ obligations would be purely speculative.
In sum, the circumstances supporting a finding of materiality do not appear to be present here.
More generally, we can distill from the Restatement’s list the defining feature of materiality — viz., the connection between materiality and consideration. More to the point, the Restatement will deem one party’s obligation material where it serves as consideration for the other party’s promised performance. Compare Frank Felix Assocs. v. Austin Drugs, 111 F.3d 284, 289 (2d Cir.1997) (“Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties.”) (citation omitted). Thus, the first element of § 241 of the Restatement is “the extent to which the injured party will be deprived of the benefit which he reasonably expected,” and “the benefit which he reasonably expected” is the consideration that the contract provides, § 241; see also § 241 cmt. b (“Since the purpose of the rules stated in §§ 237 and 238 is to secure the parties’ expectation of an exchange of performances, an important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange (Subsection (a)). If the consideration given by either party consists partly of some performance and only partly of a promise (see Comment a to § 232), regard must be had to the entire exchange, including that performance, in *629 applying this criterion.”) (emphasis added); § 81 (“In most commercial bargains the consideration is the object of the promi-sor’s desire and that desire is a material motive or cause inducing the making of the promise, and the reciprocal desire of the promisee for the making of the promise similarly induces the furnishing of the consideration.”). Cf id. at § 162 cmt. c. (“a misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent ... [or] if the maker knows that for some special reason it is likely to induce the particular recipient to manifest his assent”). Indeed, the Reporter’s notes to the chapter of the Restatement containing § 241 explain that the term “failure of performance,” when used in that chapter, see, e.g., id. at § 237,[17] replace the term “failure of consideration.” See Restat. (2d) Contracts, ch. 10, Introductory Note. In sum, a party’s obligation to perform or forbear will be material if it functioned as consideration, or as the reason inducing the other party’s entry into the contract.
It seems improbable that the obligations contained in Paragraph 6 functioned in some significant way as consideration for the benefits conferred by the Benefit Plan. The appellees’ obligations are set forth in the Benefit Plan in a manner that appears to make them subsidiary to the Plan’s central purpose. More specifically, the bulk of this eight-paragraph contract is devoted to setting forth DataComm’s obligations (Paragraphs 3, 4 and 7), describing the benefits that the eligible executives will receive (Paragraphs 3 and 4), and specifying the protections available to these executives in the event that Data-Comm undergoes a change in control (Paragraph 5).[18] Paragraph 6 is the only paragraph addressing the executives’ obligations; it sets forth a list of restrictions on the eligible executives’ conduct, but it does so by embedding this list within a provision stating that DataComm may terminate the benefits of an executive who fails to fulfill one of these obligations. This placement of appellees’ obligations suggests that appellees’ forbearance is not what motivates or compensates Data-Comm’s performance. Instead, the Plan memorialized a promise by DataComm to furnish its long-standing executives with certain benefits.
Indeed, the Plan’s preamble amply supports this reading, as it contains language signifying that the purpose of the Plan is to compensate appellees for their past years of service to DataComm. See App. at 44 (“WHEREAS, the Corporation desires to provide to certain of its employees (the ‘Eligible Executives’) with [sic] certain additional benefits based upon their many years of service to the Corporation ”) (emphasis added). The preamble makes no mention of an intent to secure appellees’ compliance with the restrictive provisions *630 of Paragraph 6, or to otherwise bind appel-lees in any way. The real crux of the agreement, then, is a commitment undertaken by DataComm to reward appellees’ for past consideration.
Finally, Third Circuit precedent further supports a finding that the obligations set forth in Paragraph 6 are not material. In Enterprise Energy Corp. v. United States (In re Columbia Gas Sys.), 50 F.3d 233 (3d Cir.1995), this court appealed to the Restatement to evaluate materiality:
In order to determine the materiality of the class members’ obligations, we turn first to basic contract principles. There is a distinction in the law between failure of a condition and a breach of a duty: ‘Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.’ Restatement (Second) of Contracts § 225(3) (1981). This distinction between a condition and a duty (or promise) is important here. The Restatement makes clear that while ‘a contracting party’s failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages.’ Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106, 460 N.E.2d 1077, 1081-82, 472 N.Y.S.2d 592 (N.Y.1984) (citing Restatement (Second) of Contracts § 225).
50 F.3d at 241 (footnotes omitted).[19] Columbia Gas greatly clarifies the nature of appellees’ obligations under the Benefit Plan. Paragraph 6 permits DataComm to terminate an executive’s benefits should that executive have been found to have violated one of the listed restrictions. In other words, a breach by one of the appel-lees would excuse continued performance by DataComm. However, such a breach would not, by itself,[20] subject the “nonful-filling” executive to liability for damages. Accordingly, the' appellees’ obligations should be seen as conditions, and not duties. And, “if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be execu-tory for purposes of § 365 because no material breach could occur.” Id. at 241.
For the foregoing reasons, I conclude that the Benefit Plan was not executory. Since section 365 permits rejection only of those contracts that are executory, I would affirm denial of appellants’ 365 Motion on the ground that section 365 does not apply to the contract at issue. Accordingly, I concur in judgment of the court, subject to the small reservation noted in footnote 14, supra.

. Some of the statutory language can be said to support the view that the drafters had in mind scenarios in which, after filing for bankruptcy, an employer undertakes to reduce, or entirely abrogate, benefits of employees who had retired prior to the bankruptcy filing. Thus, § 1114(1) provides:
This section shall not apply to any retiree, or the spouse or dependents of such retiree, if such retiree's gross income for the twelve months preceding the filing of the bankruptcy petition equals or exceeds $ 250,000, unless such retiree can demonstrate to the satisfaction of the court that he is unable to obtain health, medical, life, and disability coverage for himself, his spouse, and his dependents who would otherwise be covered by the employer's insurance plan, comparable to the coverage provided by the employer on the day before the filing of a petition under this title.
11 U.S.C. § 1114(1) (emphasis added). A similar perspective is to be found in the legislative history; see Senate Report 100-119's statement that the “bill requires that such benefits, provided to retired employees, their spouses and dependents pursuant to a plan in effect at the time of [sic] a Chapter 11 proceeding is commenced, will continue to be paid when the employer providing those benefits files ... a petition under Chapter 11 of the Bankruptcy Code, until or unless a modification is agreed to by the parties or ordered by the court.” S.Rep. No. 100-119, at 3 (1988), reprinted in 1988 U.S.C.C.A.N. 683, 685 (May 26, 1988) (emphasis added).
On the other hand, it is not clearly apparent that Congress would have had any policy reason to exclude from the protection of § 1114 employees who had retired after the debtor-employer filed for bankruptcy but before it moved to jettison its retirement-benefits liabilities.

. See 11 U.S.C. § 365 ("[T]he trustee, subject to the court’s approval, may assume or *627 reject any executory contract or unexpired lease of the debtor.”).

. Clause (ii) of Paragraph 6 references "violations] of any confidentiality or similar agreements with the Corporation ...”

. Section 237 qualifies the phrase “failure of performance” with the word "material.” See id. ("it is a condition of each party’s remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.”) (emphasis added). Section 241 also pertains to material failures of performance (i.e., what were formerly referred to as "failures of consideration”), although its language is somewhat more elaborate. See § 241 (describing "whether a failure to render or to offer performance is material.”).

. The remaining paragraphs specify the names of the eligible executives (Paragraph 1), define terms used in the Plan (Paragraph 2), permit DataComm to terminate an executive's benefits in the event that he violates a restriction described in the Agreement (Paragraph 6), and provide for the severability of any provision deemed unenforceable (Paragraph 8).

. As the Columbia court noted, ."[t]he Restatement has dropped the term 'condition precedent’ in favor of simply stating it as 'condition.' E. Allen Farnsworth, 2 Farns-worth on Contracts § 8.2, at 349 (1990).” 50 F.3d at 241 n. 15.

. The confidentiality agreements cited in the Plan or the doctrine of loyalty might have subjected an executive who breached his duty of confidentiality or loyalty to liability, but this consequence would have emerged from a legal relationship that existed independent of the relationship forged by the Plan.